CURTIS NOLL CORPORATION (Successor to Central Massachusetts Warehouse, Inc.), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CURTIS NOLL CORPORATION (Successor to General Automotive Supply Company), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Curtis Noll Corp. v. Commissioner
Docket Nos. 12814-78; 12815-78
United States Tax Court
T.C. Memo 1982-363; 1982 Tax Ct. Memo LEXIS 380; 44 T.C.M. (CCH) 288; T.C.M. (RIA) 82363; June 28, 1982
*380 Petitioners acquired assets of four corporations in the business of automotive parts sales and one corporation in the warehouse business. Held, the total value of opening inventory for petitioners was $ 1,332,646.35; held further, a portion of the purchase price was attributable to goodwill; held further, the value of such goodwill is determined by use of the "residual" or "gap" method. *381 Stephen L. Buescher and James T. Crowley, for the petitioners. John P. Graham, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge:* By notices of deficiency dated August 15, 1978, respondent determined deficiencies in petitioners' Federal income taxes for the years and in the amounts as follows: Docket
No.
Petitioner
Year
Deficiency
12814-78
Curtis Noll Corp.
8/6/73 to 12/31/73
$ 100,725.48
(Successor to Central
1974
88,137.93
Massachusetts Warehouse,
Inc.)
12815-78
Curtis Noll Corp.
8/6/73 to 12/31/73
287,548.39
(Successor to General
1974
165,418.07
Automotive Supply
Company)
These cases have been consolidated for purposes of trial, briefing, and opinion. After concessions, the issues for our decision are (1) whether the purchase price paid by petitioners in 1973 to acquire a number of corporations was improperly allocated to inventory, thereby resulting *382 in overstatement of cost of goods sold by each petitioner for each of the taxable years in issue, and (2) whether a portion of the purchase price was properly allocable to intangible assets. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts, along with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Curtis Noll Corporation (hereinafter Curtis Noll) was a corporation organized under the laws of the State of Delaware with its principal place of business at the time it filed petitions herein at Eastlake, Ohio. The primary activity of petitioner was acting as a supplier of automotive replacement parts; as such, it was involved in a variety of activities ranging from product development to retail distribution. The returns of petitioner were filed with the Internal Revenue Service Center at Cincinnati, Ohio. During the periods here in issue, Central Massachusetts Warehouse, Inc. (hereinafter New Central Mass.) was a wholly owned subsidiary of Curtis Noll Corporation, an Ohio corporation (hereinafter Curtis-Ohio), which was the predecessor of petitioner Curtis *383 Noll Corporation. New Central Mass. was organized under the laws of the State of Ohio, with its principal place of business at Worcester, Massachusetts. The separate corporate income tax returns of New Central Mass. for the periods here involved were filed with the Internal Revenue Service Center at Andover, Massachusetts. General Automotive Supply Company (hereinafter New General) also was a wholly owned subsidiary of Curtis-Ohio. New General was organized under the laws of the State of Ohio with its principal place of business at Worcester, Massachusetts. The separate corporate income tax returns of New General, and the amendments thereto, for the periods here involved were filed with the Internal Revenue Service Center at Andover, Massachusetts. [1]
*384 Early in 1973 Curtis-Ohio became interested in the acquisition of the assets of five corporations: Central Massachusetts Warehouse, Inc. (hereinafter Old Central Mass.), General Automotive Supply Company (hereinafter GAS-Worcester), General Auto Parts, Inc. of Milford (hereinafter GAP-Milford), Eastern Bumper Corporation (hereinafter Eastern Bumper), and General Auto Parts, Inc. of Webster (hereinafter GAP-Webster) (hereinafter collectively referred to as the acquired companies). Old Central Mass. was a warehouse operation and the other four corporations primarily were jobbers of auto parts and supplies. The four also offered merchandise for sale to the general public. All of these were Massachusetts corporations and were related to each other by virtue of ownership of most of their outstanding stock by Joseph R. Cohen and his brother Thomas Cohen. The Cohens founded the business that was carried on by the acquired companies around 1920. The possible acquisition of the assets of the acquired corporations initially was presented to the board of directors of Curtis-Ohio early in 1973. The written proposal briefly noted the possible existence of inventories the true value of *385 which was in excess of the book value of such inventories. Mr. Gregory J. Stodnick, who was then the treasurer of Curtis-Ohio and who had had extensive prior accounting experience as an employee of the accounting firm of Ernst & Whinney, assisted in preparation of the proposal. Thereafter Mr. Stodnick was named to a committee of three people who were responsible for investigation of the potential acquisition. Toward that end, Mr. Stodnick went to Massachusetts in March or April 1973 to ascertain whether the representations of the target companies with respect to their financial condition were accurate and to look at the warehouse inventory. Mr. Stodnick returned to Ohio after visiting only one of the nine business locations of the acquired companies. On May 19, 1973 employees of Curtis-Ohio and the accounting firm of Ernst & Whinney, with the cooperation of employees of the acquired companies, conducted a physical inventory of the acquired companies. [2] Representatives of Ernst & Whinney and/or the Curtis-Ohio internal audit staff were present at each inventory location to observe the procedures and to make test counts. *386 In order to ascertain a value for the inventory, the procedure followed was to multiply individual items counted by their appropriate unit prices. In the case of 68 percent of the inventory, the unit price was printed on the "Nu-Way sheets" that were employed to record the physical count. "Nu-Way sheets" are prepared by Nu-Way Automotive Systems, Inc., of Columbus, Ohio and list the various products sold by each automotive parts manufacturer by number and description. The forms also list a unit price for each product provided by the manufacturers. [3] In the case of 26 percent of the inventory, the inventory count was recorded on manufacturer's price sheets. The unit prices reflected on such sheets were the manufacturer's suggested jobber-level prices. In the case of the 6 percent of the inventory that was recorded on blank Curtis-Ohio inventory forms, the unit price was determined after the physical count. Ernst & Whinney did not express an opinion with respect to the inventory account balances because the examination was not conducted in accordance with generally accepted auditing standards. *387 Since the acquired corporations often could purchase at the lower warehouse-level prices than the jobber prices reflected on the Nu-Way sheets, a discount factor had to be estimated and applied to the calculation in order to lower the value of the inventory. In addition, the value of the May 19, 1973 inventory was reduced by at least $ 399,000 to reflect errors in pricing and clerical accuracy and to provide for obsolescence and nonreturnable inventory. Based upon the count and the unit pricing method (subject to discount) described above, the value of the inventory of the acquired companies was estimated as of May 19, 1973. Curtis-Ohio brought these inventory amounts forward from May 19, 1973 to May 31, 1973 by computing adjustments for transactions during the period (subtracting sales and adding purchases), resulting in inventory values as follows: Value of inven-
Value of inven-
tory as of
tory as of May 31,
May 19, 1973,
1973, determined
determined by
Inventory
Inventory
by
petitioner
reductions
additions
petitioner
General Automotive
Supply Co.
$ 1,273,052.23
($  66,706)
$  58,637
$ 1,264,983.23
General Auto Parts
of Webster
70,942.35
(    2,995)
3,641
71,588.35
General Auto Parts
of Milford
92,618.92
(    7,462)
6,047
91,203.92
Eastern Bumper
114,620.52
(   12,064)
8,652
111,208.52
Subtotal
$ 1,551,234.02
($  89,227)
$  76,977
$ 1,538,984.02
Central Mass. Ware-
house
668,041.30
(   31,583)
51,673
688,131.30
Total
$ 2,219,275.32
($ 120,810)
$ 2,227,115.32
*388 By contrast, the May 31, 1973 book values for inventory indicated on the unaudited balance sheets of the acquired companies were as follows: Difference between May 31
Balance sheet
book value and May 31 value
book value as
of inventory as determined
of May 31, 1973
by petitioners
GAS-Worcester
$   504,132
$ 760,851.23
GAP-Webster
61,350
10,238.35
GAP-Milford
85,984
5,219.92
Eastern Bumper
93,005
18,203.52
Subtotal
$   744,471
Old Central Mass.
507,958
180,173.30
Total
$ 1,252,429
Since the acquisition of assets took place on September 30, 1973, it was necessary to arrive at a closing inventory value for the acquired companies as of that date. Curtis-Ohio adjusted the May 31, 1973 book values to reflect transactions that occurred between May 31, 1973 and September 30, 1973. Curtis-Ohio determined that the adjusted value of inventory of the acquired companies as of September 30, 1973 was as follows:[4]
GAS-
GAP-
GAP-
Worcester
Webster
Milford
May 31, 1973 book value
$   504,132.00 n3 $ 71,588.35 n3 $ 91,203.92
Adjustment for trans-
actions between May 31
and Sept. 30
51,476.35 (7,352.47)
(8,290.44)
Adjustment for dif-
ference between May 31
book value and May 31
value from physical
count, as extended
from May 19
[1] 453,113.59 10,238.35 5,219.92 Adjusted Sept. 30
inventory value
$ 1,008,721.94 $ 74,474.23 $ 88,133.40 Additional adjustment
to balance New Gen-
eral's opening
inventory
[2] (3,793.05)
--     --     Final Sept. 30
inventory value
$ 1,004,928.89 --     --     *389 Eastern
Old Central
Bumper
Mass.
May 31, 1973 book value
[3] $ 111,208.52 $ 507,958.00
Adjustment for trans-
actions between May 31
and Sept. 30
363.30 15,665.43
Adjustment for dif-
ference between May 31
book value and May 31
value from physical
count, as extended
from May 19
18,203.52
[4] 18,484.31
Adjusted Sept. 30
inventory value
$ 129,775.34 $ 542,107.74
Additional adjustment
to balance New Gen-
eral's opening
inventory    Final Sept. 30
inventory value    *390 These closing values for inventory were carried over onto New General's and New Central Mass.'s opening balance sheets. The total value of inventory alleged by petitioners to have been acquired in the transaction was $ 1,839,419.60. The values of the assets purchased (other than any intangible assets), as they appeared on the closing books of the acquired companies, totaled $ 2,546,657.40. The book values were as follows: GAS-
GAP-
GAP-
Asset
Worcester
Webster
Milford
Cash
$    91,159.22
$ 20,604.02
$  23,325.45
Accounts
receiv-
able
529,680.98
7,994.71
34,522.96
Inventory
537,485.25
64,494.87
82,913.48
Prepaid in-
surance
9,202.66
1,054.57
1,370.67
Other
assets
147.41
25.00
249.19
Depr. assets
autos/trucks
(net)
37,146.95
222.91
4,724.30
F/F (net)
19,262.71
134.86
1,348.74
Leas. Imp.
(net)
5,458.90
--   2,636.15
TOTALS
$ 1,229,544.08
$ 94,530.94
$ 151,090.94
Eastern
Old Central
Asset
Bumper
Mass.
Totals
Cash
$  32,202.96)
($  10,951.09)
$    91,934.64
Accounts
receiv-
able
114,289.34 303,328.29 989,816.28
Inventory
114,654.45 533,098.30 1,332,646.35
Prepaid in-
surance
1,626.34 3,584.53 16,838.77
Other
assets
1,427.50 --    1,849.10
Depr. assets
autos/trucks
(net)
3,938.23 7,051.46 53,083.85
F/F (net)
2,244.08 7,063.86 30,054.25
Leas. Imp.
(net)
733.38 21,605.73 30,434.16
TOTALS
$ 206,710.36 $ 864,781.08 $ 2,546,657.40
*391 The acquisition by Curtis-Ohio of all of the assets of the acquired companies, including the nine stores and one warehouse, together with their 100-odd employees, took place as of September 30, 1973. The deal was structured through two simultaneous agreements, each contingent upon the other, that involved as purchasers the two entities controlled by Curtis-Ohio, New Central Mass. and New General. One purchase agreement was dated September 20, 1973 between Old Central Mass., as the seller, and New Central Mass., as the buyer. The second purchase agreement also was dated September 20, 1973, between GAS-Worcester, GAP-Webster, GAP-Milford, and Eastern Bumper, as sellers, and New General, as the buyer. The agreements each provided for the purchase of all of the assets of the sellers, including all property, tangible or intangible, real, personal or mixed, cash, leasehold improvements, claims, contractual and other rights of every kind, accounts receivable, inventory, insurance policies, prepayments, corporate names, trade names, trademarks, patents, patent licenses, books and records, catalogs and price lists. The agreements also provided for assignments of all the leases used *392 in the business and bound the sellers to preserve the business organizations and operations intact. The sellers warranted that they had no knowledge of any facts inconsistent with the continued operation of the business by the buyers. The agreements provided for the execution of employment agreements by the key officers and management personnel and a guaranty of payment of the accounts receivable by the sellers. In addition, the agreements represented that the sellers should have delivered to the buyers certain pro forma statements of income and retained earnings and a combined balance sheet. Such financial statements, upon which inventory book values were reflected, were represented by the seller to have been prepared in accordance with generally accepted accounting principles and to present fairly the financial position of the acquired corporations. The cash paid by New General and New Central Mass. for the acquired companies in the amount of $ 1,578,796.40 included actual cash payments to the prior owners of the acquired companies in the amount of $ 1,459,731.23, finder's fee of $ 68,389.25, and other miscellaneous expenses amounting to $ 50,675.92 for inventory count, travel, *393 legal and accounting fees. In addition, pursuant to the agreements, New General and New Central Mass. assumed liabilities of the acquired companies in the total amount of $ 1,653,446.73. [5] Accordingly, the total purchase price was $ 3,232,243.13. *394 The method of inventory valuation elected by both the new corporations and the acquired companies to keep their books was the lower of cost or market. The acquired companies' unaudited consolidated statement of income and expenses for the 12 months ended May 31, 1973 was as follows: Net sales
$ 6,289,276 Cost of goods sold
(3,989,015)
Gross profit
$ 2,300,261 Miscellaneous income
7,698 Total
$ 2,307,959 Operating expenses
(1,907,279)
Net profit before
Federal income tax
400,680 Provision for Federal
income tax
(   186,000)
Net profit after tax
$   214,680 For the period from August 6, 1973 [6] to December 31, 1973, the acquiring corporations, New General and New Central Mass., reported sales and profits on the corporate Federal income tax returns as follows: New
New
Central
General
Mass.
Total
Net sales
$ 1,151,149
$ 848,813
$ 1,999,962
Cost of goods
710,497
786,946
1,497,443
sold
Gross profit
$   400,652
$  61,867
$   502,519
*395 Thus, the combined gross profit margin (gross profit as a percentage of net sales) for the partial 1973 year was approximately 25 percent. For 1974, the acquiring corporations reported sales, cost of goods sold, and gross profit as follows: New
New
Central
General
Mass.
Total
Net sales
$ 4,868,333
$ 2,868,216
$ 7,736,549
Cost of goods
3,188,342
2,538,233
5,726,575
sold
Gross profit
$ 1,679,991
$   329,983
$ 2,009,974
The 1974 combined gross profit percentage was approximately 26 percent. In April 1976, in connection with an audit of petitioners' tax returns, Mr. Charles O'Malley (hereinafter Mr. O'Malley), an engineer employed by the Internal Revenue Service, visited a number of the acquiring corporations' properties and prepared a valuation report. In his report Mr. O'Malley recommended that the allocation of the purchase price claimed by petitioners be adjusted to reflect decreased inventory values and a substantial reallocation to intangible going concern value. Mr. O'Malley noted that almost 2-1/2 years after the acquisition the stores had approximately the same volume of business, were operating without the expensive *396 services of Joseph and Thomas Cohen, and had improved efficiency by consolidating operations. With respect to the inventory valuation, Mr. O'Malley attempted to ascertain an explanation for the discrepancy between the taxpayers' valuation ($ 1,839,419) and the value recorded on the books of the acquired corporations ($ 1,332,646). [7] First, he noted that the acquired corporations' returns indicated inventory turnovers ranging from two per year at Old Central Mass. to about six per year at the other acquired companies, a fact that is borne out by the stipulations of the parties to this case. Second, he contended that the use of the Nu-Way estimating sheets was not the most accurate method of valuing inventory. Finally, he took the position that the portion of the purchase price attributable to inventory should be reduced for a bulk sale. Mr. O'Malley concluded that the fair market value of the inventory as of September 30, 1973 was no greater than the acquired companies' book value of $ 1,332,646. With respect to the presence *397 of intangible value, Mr. O'Malley alleged that the following intangible assets were transferred as part of the sale of the business: (1) retention of prior company names (e.g., General Automotive Parts, Eastern Bumper Corp., and Central Massachusetts Warehouse); (2) retention of company personnel and customer relations; (3) retention of essentially all customers; (4) acquisition of an established and trained sales organization; (5) assumption of prior real property leases and the addition of any further leases needed from the former owners; (6) reputation of an established firm serving the public since the 1920's; (7) carryover of all advertising; (8) covenants not to compete from the former owners; (9) acquisition of a stable business which complements Curtis-Noll's existing auto parts business and offers expansion in the Worcester, Massachusetts area; (10) specific wording in the purchase contract to cover intangibles; and (11) transfer of complete business as a "going concern." Using a capitalization of excess earnings approach, Mr. O'Malley determined that the value of intangibles was $ 568,713.10. For the taxable period August 6, 1973 through December 31, 1973 and for the taxable *398 year 1974, New Central Mass. reported for Federal income tax purposes losses in the amounts of approximately $ 20,426 and $ 52,582, respectively. For the taxable period August 6, 1973 through December 31, 1973, New General reported for Federal income tax purposes taxable income of approximately $ 49,515. For the taxable year 1974 New General reported for Federal income tax purposes a loss (rounded to even dollars) in the amount of $ 427,498. However, on its amended Federal corporate income tax return for 1974, New General subsequently claimed a loss of only $ 185,830. Respondent, in his notices of deficiency, determined that petitioners had overstated their cost of goods sold for the taxable period August 6, 1973 through December 31, 1973 and the taxable year 1974, thereby resulting in an understatement of taxable income for each period. In addition, respondent determined that petitioners had claimed a deduction for depreciation in excess of the amount allowable. OPINION The first question for our consideration is whether petitioners accurately stated the amount of opening inventory that was acquired in the September 30, 1973 purchase of five corporations. Respondent alleges *399 that petitioners overstated the value of opening inventory, thereby resulting in an overstated cost of goods sold, and a corresponding understatement of income in 1973 and 1974. [8] He contends that petitioners took such action to conceal the acquisition of intangible assets, such as going concern value or goodwill. In light of the evidence, respondent asserts that petitioners should have included inventory on their opening balance sheet at the closing book values of the acquired companies. Petitioners, on the other hand, claim that their computation of the value of inventory is supported by the May 19 physical inventory count and the value of inventory computed from that count as brought forward to September 30, 1973. The burden is on petitioners to submit evidence that will overcome the presumption of correctness that attaches to respondent's determination. Steel or Bronze Piston Ring Corporation v. Commissioner, 13 T.C. 636, 644 (1949); National Mill Supply Co. v. Commissioner, 23 B.T.A. 1363, 1372 (1931), affd. 62 F.2d 420 (7th Cir. 1933). *400 [9]
It is well established that the basis of acquired property is its cost. Secs. 1011, 1012. Where a variety of assets is acquired as a whole for a lump sum, the total purchase price must be allocated over the various types of property. *401 Piper v. Commissioner, 5 T.C. 1104, 1109 (1945). Allocation of basis should be based on the relative fair market value of each asset at the time of acquisition. F. & D. Rentals, Inc. v. Commissioner, 365 F.2d 34, 40 (7th Cir. 1966), affg. 44 T.C. 335, 345-347 (1965); Bryant Heater Company v. Commissioner, 231 F.2d 938, 940 (6th Cir. 1956), remanding a Memorandum Opinion of this Court; C.D. Johnson Lumber Corporation v. Commissioner, 12 T.C. 348 363 (1949). Accordingly, we must determine whether petitioners have produced sufficient evidence of the fair market value of the inventory acquired in order to carry their burden. Petitioners have put forth extensive testimony and documentary evidence in their attempt to establish that the total value of the inventory they acquired on September 30, 1973 was $ 1,839,419.60. They base their calculation on a physical count of the inventory on hand as of May 19, 1973 and an estimate of the value of such inventory as adjusted for purchases and sales and other adjustments in value for the period from May 19, 1973 through September 30, 1973. Unfortunately for *402 petitioners, we believe that their calculations are fraught with too many uncertainties, estimations and inaccuracies to be accepted by us. For instance, three different inventory forms were used to record the physical count. It is unclear whether the same pricing level (i.e., warehouse, jobber or wholesale prices) was used on each sheet [10] and whether such pricing was consistent with the lower of cost or market method of valuing inventory that was employed by the acquired companies. Second, the testimony at trial indicated that the acquired companies often could purchase inventory at warehouse-level prices. In light of this fact, petitioners appear sometimes to have reduced the value of inventory recorded on the inventory sheets by an estimated percentage thereof. The percentage varied from sheet to sheet and sometimes was missing. While some adjustment might have been in order, the amount of the adjustment is unsupported. Petitioners have made no showing that the estimated percentages indicated on the bottom of some inventory sheets (20 or 21 percent) were consistently applied, or that such percentage reductions accurately reduced the jobber value of inventory shown on the *403 sheets to the warehouse-level prices (which reflected petitioners' true cost for the goods). Further, the necessity for any percentage adjustment casts doubt on the accuracy of the use of a single price level for valuing the assets of corporations that acquired their inventory at different price levels. More specificity is required. Third, in bringing the May 19 inventory value forward to May 31 and then to September 30, estimates were required for the adjustments for obsolescence, clerical errors, and "additional adjustment to balance account" (in the case of GAS-Worcester). The reasons for making these adjustments and the amounts thereof have not been adequately substantiated. Furthermore, petitioners have not convinced us that any inventory was purchased that was not reflected on the books of the acquired companies. Joseph R. Cohen, one of the sellers, testified that he never told the purchasers of the existence of any excess inventory, that he was not aware of any such unrecorded inventory, and that he *404 believed the closing inventory figures of the acquired companies to have been reasonably accurate. We agree. In addition, the fact that the purchase agreements make no allocation of the total purchase price to inventory indicates to us that the only inventory intended to be transferred was that which was recorded on the books of the acquired companies. Finally, the parties have stipulated that the acquired companies valued inventory using the lower of cost or market method. They also have stipulated that the warehouse operation had an average annual inventory turnover of about twice per year, and the retail operations had an average of six turnovers per year. When valuing inventory on the lower of cost or market method, "cost" refers to the price paid to purchase or produce the goods, while "market" refers to the current bid price (i.e., replacement cost) on the inventory date for the particular merchandise in the volume in which it is usually purchased by the taxpayer. Sec. 1.471-3, -4, Income Tax Regs. In businesses such as those of the acquired companies, where inventory turns over rapidly and must be replaced often, we are convinced that the value of inventory reflected *405 on the books closely approximates the fair market (replacement) value of such inventory. Therefore, we believe that petitioners properly should have used the book value of the acquired corporations' closing inventory as the amount of their opening inventory. Accordingly, we uphold respondent's determination that $ 533,098.30 was the proper opening inventory value for New Central Mass. and $ 799,548.05 was the proper opening inventory value for New General, for a total opening inventory value of $ 1,332,646.35. Having so determined, we turn to the second issue: whether part of the purchase price was paid for the acquisition of intangible goodwill or going concern value. Respondent argues that the 11 factors set out by Mr. O'Malley in his Engineer's Report indicate that goodwill was acquired by petitioners in the acquisition and that some additional value attaches to the tangible assets by reason of their existence as part of a going concern. Petitioners contend that neither goodwill nor going concern value was acquired. As the two are "separate and distinct" intangible assets, Concord Control, Inc. v. Commissioner, 615 F.2d 1153, 1155 (6th Cir. 1980), affg. in *406 part and remanding in part a Memorandum Opinion of this Court, an individual determination with respect to the presence of each must be made. Considering first whether going concern value was acquired, we have held that "going concern value * * *, as distinguished from goodwill, is the increase in the value of assets due to their existence as an integral part of an ongoing business." [11] In this case, the asset most integral to the acquired companies' business and the most valuable asset transferred was the inventory. Suffice it to say that we agree with petitioners' argument that the inventory did not have any going concern value above its replacement cost. In businesses where inventory is replaced two or even six times per year, it is reasonable to assume that a new entrepreneur could start up and stock a competitor rather quickly. As such, there were few significant barriers to entry into the auto parts business, and the competitive advantage of the acquired corporations that was attributable solely to their status as ongoing businesses was minimal. [12]
*407 In addition, we do not believe that the value of the inventory was enhanced by reason of being sold in bulk. We base this belief on the statement in the report of respondent's engineer that the sale of inventory as a package was worth less, not more, than the price paid for it by petitioners. Furthermore, tangible depreciable assets (other than inventory) to which going concern value normally attaches, such as fixtures or capital equipment, constituted only a small portion of the value of the assets acquired. Accordingly, we conclude that no portion of the value of the acquired businesses should be attributed to going concern value. With respect to goodwill, however, our conclusion is different. A finding of goodwill depends upon an expectancy of continued high earnings capacity and continued customer patronage or competitive advantage, for whatever reason. Concord Control, Inc. v. Commissioner, 615 F.2d at 1155; Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 681 (5th Cir. 1971). From the entire record, it is clear to us that after the *408 acquisition New General and New Central Mass. enjoyed the benefits of being successors to well-established businesses. First, the purchase agreements provided for the sale of "all of the Seller's business and assets * * * whether or not appearing on the pro forma combined balance sheet of [the acquired corporations] * * * including without limitation all property, tangible or intangible * * *." This language is supplemented by the testimony of Mr. Joseph R. Cohen, one of the sellers, that it was his belief that a portion of the purchase price was received for goodwill. Second, the Cohens had operated their automotive parts business in the same area for over 60 years. We think that it is not unfair to assume that a favorable reputation of the stores and the warehouse operation had developed over the years and contributed to the longevity of the businesses. Nor do we believe that petitioners were unmindful of the well-established position of the acquired businesses. Third, while gross profit percentage following the acquisition may have declined from that of the fiscal year of the acquired companies ended May 31, 1973, net sales for the 1974 calendar year showed an increase *409 from the period prior to the acquisition. We are not convinced that the drop in gross profit percentage indicates an absence of the transfer of goodwill. Rather such a decline may have been due to external market conditions, changes in internal management policies instituted by petitioners, or some other reason. Fourth, we are convinced that a number of the indicia examined by Mr. O'Malley support a finding of the existence of goodwill. For example, company names, personnel, store leases and advertising were transferred pursuant to the agreements. Although some names may have been changed by petitioners, some personnel replaced, and one store closed after the September 30, 1973 transactions, we are convinced that the transfer of well-established company names, trained personnel, and good store locations were components of valuable goodwill. See Skilken v. Commissioner, 420 F.2d 266, 270 (6th Cir. 1969), affg. 50 T.C. 902 (1968). Finally, as indicated above, we view the longevity of the acquired businesses as evidence of their favorable reputation among customers. As such, the acquisition of the good reputation of the acquired companies was yet *410 another component of the valuable goodwill that was transferred. While price may have been the factor of primary importance in determining customer preferences in the business of automotive parts sales, we think that the fact that the acquired companies had been in business for so long indicates a record of competitive prices as well as good service and good customer relations. These factors all translate into a favorable reputation that carried over to petitioners and must be valued as part of goodwill. Having determined that a portion of the purchase price paid by petitioners was attributable to goodwill, it remains to determine the value of such goodwill. In Concord Control, Inc. v. Commissioner, 78 T.C. (Apr. 28, 1982), we examined a number of methods for valuing going concern value, an intangible asset. One such method, the "residual" or "gap" method, was described as follows: Under the "residual" or "gap" method, going concern value is determined by subtracting the value of the tangible assets from the total purchase price. See Jack Daniel Distillery v. United States, 180 Ct. Cl. 308, 379 F.2d 569 (1967); *411 R. M. Smith, Inc. v. Commissioner, 69 T.C. 317, 320-323 (1977), affd. 591 F.2d 248 (3d Cir. 1979), cert. denied 444 U.S. 828 (1979). The use of such method is proper where the value of the tangible assets and the value of the business can be ascertained with reasonable certainty. Northern Natural Gas Company v. United States, 470 F.2d 1107, 1110 (8th Cir. 1973), cert. denied 412 U.S. 939 (1973); Jack Daniel Distillery v. United States, supra.[5]
Concord Control, Inc. v. Commissioner, supra, Slip 0p. at pp. 6-7. We believe that use of the "residual" or "gap" method is appropriate to measure the value of goodwill in this instance. Using the fair market value of inventory that we determined, supra, the total value of tangible assets transferred was as follows: New
New
General
Central Mass.
Total
Cash
$   102,885.73
($  10,951.09)
$    91,934.64
Accounts
receivable
686,487.99
303,328.29 989,816.28
Inventories
799,548.05
533,098.30 1,332,646.35
Prepaid Insur-
ance
13,254.24
3,584.53 16,838.77
Other assets
1,849.10
--     1,849.10
Net depreciable
assets:
Autos/trucks
46,032.39
7,051.46 53,083.85
Furniture/fix-
tures
22,990.39
7,063.86 30,054.25
Leasehold im-
provements
8,828.43
21,605.73 30,434.16
Total
$ 1,681,876.32
$ 864,781.08 $ 2,546,657.40
*412 Applying the residual method formula, the amount of goodwill is determined as follows: Purchase price
$  3,232,243.13 Total value of tangible
assets
(2,546,657.40)
Value of goodwill
$    685,585.73 In view of the foregoing, Decisions will be entered under Rule 155. Footnotes
*. These cases were tried before Judge Sheldon V. Ekman, who passed away on Jan. 18, 1982. By order of the Chief Judge these cases were reassigned to Judge Samuel B. Sterrett↩ for disposition.
1. By a series of transactions among New Central Mass., New General, Curtis-Ohio, petitioner Curtis Noll and other related companies, which occurred after the periods here involved, petitioner Curtis Noll succeeded to the assets and liabilities of New Central Mass. and New General and was the proper party, under sec. 6213, I.R.C. 1954↩, to bring these actions. Subsequent to the filing of the petitions in these cases, Congoleum Corporation succeeded to the assets and liabilities of petitioner Curtis Noll.
2. The parties have stipulated that the count of the individual items present in the inventory and used by New General and New Central Mass. to establish their opening inventories was correct.↩
3. There are four pricing levels: warehouse, jobber (distributor), wholesale and retail. Although there is some uncertainty in the record, we believe that the unit prices on the Nu-Way sheets were prices at the jobber level. Jobber-level prices are prices at which jobbers would sell to wholesalers.↩
4. We express no opinion, at this point, about the correctness or accuracy of petitioners' calculation. ↩
1. Petitioner New General calculated the Sept. 30, 1973 value for inventory of GAS-Worcester by beginning with the value of inventory that they determined from the May 19, 1973 physical count ($ 1,273,052.23), and reducing that amount by an allowance ($ 307,737.64) for clerical errors and obsolescence. (The reduction for obsolescence was taken both to reflect a fair estimate of obsolete inventory and to make New General's opening books balance.) The difference between their May 19 physical inventory value as so adjusted ($ 965,314.59) and the amount assigned to the May 19 book value of inventory ($ 512,201.00) was $ 453,113.59. This amount then was added to the Sept. 30 1972 value of inventory, as adjusted for transactions from May 30 to Sept. 30 ($ 555,608.35), to arrive at a Sept. 30, 1973 adjusted value for inventory of $ 1,008,721.94. ↩
2. Petitioner appears to have further adjusted its calculation of the value of inventory to reflect the value chosen for the opening inventory of New General on the new corporation's books. We note here that such an adjustment reflects a misapplication of the chicken and the egg: the opening inventory amount should be derived from the value of the acquired company's closing inventory and should not have an impact on determining such value. ↩
3. Petitioners have not explained why they chose as a starting point for their calculation an amount different than that reflected on the balance sheet as the book value of inventory as of May 31, 1973. See p. 8, supra↩. 4. In the case of Old Central Mass., the May 19 value of inventory from the physical count ($ 668,041.30) was reduced by petitioners for certain clerical errors ($ 86,765.10) and for obsolescence ($ 58,127.62) in the total amount of $ 144,892.72. (Reduction for obsolescence was taken for two reasons: to reflect a fair estimate of obsolete inventory and to make the opening books balance.) This resulted in a markdown of the May 19 physical inventory value to $ 523,148.58. The difference between Old Central Mass.'s May 19 physical inventory value as so adjusted ($ 523,148.58) and the amount assigned to book value as of May 19 ($ 504,456.00) was $ 18,692.58. (Petitioners do not explain why they used a different amount, $ 18,484.31, as the adjustment in their calculation.) This difference ($ 18,484.31) was then added to the Sept. 30 book value of inventory, as adjusted for transactions from May 30 to Sept. 30 ($ 523,623.43), to arrive at a Sept. 30 adjusted value for inventory of $ 542,107.74.↩
5. The liabilities of the acquired companies that were assumed include: GAS-
GAP-
GAP-
Worcester
Webster
Milford
Accounts payable - trade
$ 362,173.65
$  9,731.19
$ 39,951.08
Accounts payable - inter-
company
--
--
--
Accounts payable - officers
--
--
--
Accrued expense
2,500.00
--
--
Accrued interest
1,315.69
--
--
Employee compensation
-- 9,655.00
--
Payroll tax
3,908.49
395.37
--
Other taxes
3,729.30
728.96
--
Loans payable
17,000.00
--
--
Bank debt
100,000.00
--
--
Debt to B. Cohen
263,137.54
--
--
Debt - intercompany
--
--
--
Total
$ 753,764.67
$ 20,510.52
$ 39,951.08
↩
Eastern
Old Central
Bumper
Mass.
Accounts payable - trade
$ 3,870.30
$ 366,855.28
Accounts payable - inter-
company
--
126,205.07
Accounts payable - officers
--
10,000.00
Accrued expense
--
1,503.46
Accrued interest
--
--
Employee compensation
--
--
Payroll tax
--
2,953.00
Other taxes
--
--
Loans payable
--
--
Bank debt
19,500.00
158,333.35
Debt to B. Cohen
--
--
Debt - intercompany
--
150,000.00
Total
$ 23,370.30
$ 815,850.16
6. Petitioners do not indicate why they filed returns for the period beginning on Aug. 6, 1973 if the sale was not consummated until Sept. 30, 1973.↩
7. Petitioners' representative explained to Mr. O'Malley that the difference was due to inventory not recorded on the books of the old corporations.↩
8. Gross income is determined by subtracting cost of goods sold from gross sales. Cost of goods sold is computed by adding purchases (additions to inventory) to opening inventory, and then subtracting closing inventory. Therefore, an overstated opening inventory will increase the value of cost of goods sold and cause a corresponding reduction in gross income. ↩
9. On brief, respondent indicates that his agents put the entire inventory adjustment in both the Aug. 6, 1973 to Dec. 31, 1973 taxable period and the 1974 taxable year to reflect the distortion in income caused by the purported undervaluing of inventory. He indicates, however, that there is a factual basis to split the adjustment. We trust that the parties will reflect such an adjustment in the computations to be submitted pursuant to Rule 155, Tax Court Rules of Practice and Procedure.↩
10. For instance, the record includes no indication of what level prices were used to value the inventory that was recorded on the blank Curtis-Ohio inventory forms.↩
11. Concord Control, Inc. v. Commissioner, T.C. Memo. 1976-301, affd. in part 615 F.2d 1153 (6th Cir. 1980), on remand 78 T.C. (Apr. 28, 1982). See also VGS Corp. v. Commissioner, 68 T.C. 563, 591↩ (1977). 12. In fact, the testimony indicates that soon after the acquisition, the son of one of the sellers opened auto parts stores in direct competition with the acquired stores.↩
5. See also Black Industries, Inc. v. Commissioner, supra; R. M. Smith, Inc. v. Commissioner, T.C. Memo. 1977-23↩.